E. J. NADER v. THE STATE.

No. 5507.   Decided December 10, 1919.

Rehearing denied March 24, 1920.

1.—Murder—Corrupting Witness—Third Parties—Evidence—Limiting Testimony—Impeaching Witness.

Where, upon trial of murder, the State on cross-examination of a defendant's witness, who gave material testimony for him, attempted to show that this witness had attempted to corrupt some of the State's witnesses it was well within its right provided that such testimony of impeachment was properly limited to the credibility of said witness, but, where it appeared from the record that third parties who were not witnesses in the case were included in said attempted impeachment, the same was reversible error.

2.—Same—Rule Stated—Impeaching Witness—Motive.

In all such cases the inquiry, and predicate, if one be necessary, and the impeaching testimony if called for, must be confined to what was done and said by the witness there attacked, and cannot be broadened out to include other persons and relatives whose motives are of no moment in the case. Following: Estep v. State, 9 Texas Crim. App., 367.

3.—Same—Rule Stated—Credibility of Witness—Bias—Motive—Limiting Testimony.

It must be conceded that no witness can be impeached, or his credibility attacked by showing bias or motive upon proof of an immaterial statement or act, except as to reputation or other purely collateral matters, but when the attack upon the witness is made upon a material matter it must necessarily follow that it is more or less an attack upon the party for whom such witness appears and therefore the same must be properly limited.

4.—Same—Interpreter—Partisan—Practice in District Court.

The interpreter who is sworn to interpret for the court should not be sworn in if he be a partisan or is cognizant of material facts, as was true in the instant case.

5.—Same—Accomplice—Bill of Exceptions.

Where there was nothing in the evidence raising the question of accomplice as applicable to the testimony of a certain witness named in the bill of exceptions, there was no error.

**6.—Same—Standpoint of Defendant—Charge of Court—Self-defense.**

In every case where the issue of self-defense is raised by the evidence a charge of the court should instruct the jury that in determining this issue the matter must be viewed from the standpoint of the defendant, and this though the issue is raised by the testimony of the defendant alone.

**7.—Same—Argument of Counsel—Supended Sentence.**

It was improper for State's counsel to argue to the jury his personal objection to the law of suspended sentence or any other statute which is invoked, but inasmuch as the case is reversed for other reasons the error will not again occur.

**8.—Same—Rehearing—Bills of Exception—Practice on Appeal.**

Where it was urged by the State on motion for rehearing that the original opinion indicated that the case was decided on errors which were not shown by the bills of exception but must have been considered from the statement of fact, etc., but the record showed that this court remained well within the rules laid down by the statutes and the decisions with reference to the rules governing the relation of bills of exception to statement of facts, there was no reversible error, besides, the bills of exception did raise such issue.

**9.—Same—Statements in Original Opinion.**

Where a complaint was made in the State's motion for rehearing of certain statements made by the court in its original opinion which were not born out by the statement of facts, but the record showed that this complaint was not well founded, there was no reversible error.

Appeal from the District Court of Panola. Tried below before the Hon. Charles L. Brachfield, judge.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Davidson & Blalock, Jas. Y. Gray, J. R. Duran, J. G. Woolworth,* for appellant.—On question of impeaching witness: Garcia v. State, 74 S. W. Rep., 916; Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Fink v. State, 209 S. W. Rep., 154; Fread v. State, 210 S. W. Rep., 695, and cases cited in the opinion.

*C. M. Cureton,* Attorney General, *E. F. Smith,* Assistant Attorney General, *Alvin M. Owsley,* Assistant Attorney General, *James M. Edwards,* Special Prosecutor, for the State.—On question of impeaching witness: Burnaman v. State, 70 Texas Crim. Rep., 361, 159 S. W. Rep., 244; Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 613; Gelber v. State, 56 Texas Crim. Rep., 460, 120 S. W. Rep., 863; Harvey v. State, 37 Texas, 365; Sager v. State, 11 Texas Crim. App., 110; Curry v. State, 72 Texas Crim. Rep., 462, 162 S. W. Rep., 851.

On question of limiting testimony: Bain v. State, 9 S. W. Rep., 814; Gipson v. State, 53 Texas Crim. Rep., 349, 110 S. W. Rep.,

41; Hunter v. State, 54 Texas Crim. Rep., 224, 114 S. W. Rep., 124; Hunter v. State, 59 Texas Crim. Rep., 439, 129 S. W. Rep., 125.

LATTIMORE, JUDGE.—Appellant was indicted in the District Court of Panola County, for the murder of one Bill Thomas. Upon his trial he was convicted of manslaughter, and his punishment fixed at confinement in the penitentiary for two years. Appellant asked for a suspended sentence, which was not recommended by the jury.

Appellant and deceased were both peddlers and rivals for the trade of the same territory, in which appellant had been plying his business for several years, and deceased for only a few months. There is testimony from the State's standpoint, showing ill-will and animosity on the part of the appellant against the deceased, whom he regarded as an interloper and an intruder in his trade territory. On the day of the homicide the two men met in competitive efforts to sell goods, and later met on the road, deceased being in company with one Barkett, another peddler, and appellant being alone. After a very short conversation, deceased was shot by a pistol in the hands of appellant, which resulted in his almost immediate death. Deceased was unarmed.

On the trial of the case, the appellant introduced as a witness one Alex George, who gave very material testimony for the appellant. On cross-examination this witness was asked by the State, and testified as follows: "It is not a fact that on or about the first Sunday in June, 1917, something like a month after the killing, that John Thomas and A. Nader and I, went over to Shreveport, to see the widow of Bill Thomas about settling this case, and it is not a fact that Ike Nader and I, went and talked with the widow of Bill Thomas and told her that Bill was dead and that A. Nader would pay her a large sum of money to educate the boy, the child of Bill Thomas, and advised her and tried to persuade her to take the money and drop this prosecution—I never went. I understand what you are asking me. Ike Nader is A. Nader's son. It is not a fact that Ike Nader and John Thomas and A. Nader and I have tried to get Charlie Barkett to take money and leave the country to avoid testifying in this case. It is not a fact that we four men, and that I particularly with the others, tried to get Bill Thomas's widow to take money and stay in Louisiana and not come to court— I never done it. I understand what you are asking. I have not been present in Shreveport or Marshall when A. Nader or Ike Nader or John Thomas or anybody made such an offer as that to Charlie Barkett or to Bill Thomas's widow in the presence of the mother of Bill Thomas's widow. I understand what you are asking."

Thereafter the State placed on the witnss stand, Essie Thomas, the widow of deceased, and she testified, over objection, that Alex George, and John Thomas, and old man A. Nader came to her

home at Shreveport, about a month after the killing, and offered her $600 if she would not attend the court and testify, which offer she refused. Also that Alex George told her that he was going to give Charlie Barkett $300 to leave the State and not come to court. This witness, in common with many others, talked through an interpreter, and our view of her testimony will more clearly appear from what has been shown to have been actually said, as set out in Bill of Exception No. 1, which is as follows: She was asked if Alex George himself, or any one else, came to Shreveport to talk about the killing. The reply of the interpreter is as follows: "She say Alex George and John Thomas and old man Nader they come down there and offer her six hundred dollars because Elias Nader killed her husband. They gave her that six hundred dollars to live on and her little boy."

In answer to the next question, she was interpreted as saying that they told her that they would give her that money if she did not come to court and testify. She also testified that Alex George told her that they were going to pay Charlie Barkett three hundred dollars.

Another bill of exceptions shows that the State placed on the stand one Spero Assef, by whom it was shown that A. Nader, John Thomas, and others, came to Shreveport and offered to pay sums of money to Essie Thomas and Charles Barkett if they would not appear in the prosecution. An examination of the testimony of this witness shows that the offer of money was made by A. Nader and John Thomas, though he later states that Alex George was present. Another offer was made of the same amount of money to the son of deceased, if parties would not appear, and at the time this offer was made, Assef names the parties present, but does not name the witness Alex George. We think the court erred in allowing this testimony, as it appears in the record. There seems some confusion in the decisions, because of which, we state our conclusions as to the law applicable.

If Alex George was a witness for the defense as to material matters, evidence tending to throw light on his motive, interest, bias or prejudice, would be admissible, and this would include any effort or offers made by him to induce witnesses not to appear or testify for the State, but such testimony should be limited by the court to the sole purpose of affecting, if the jury so believe, the credibility of said witness; that if the witness denies such efforts or offers, then upon a proper predicate he may be impeached by proof of the same; in which case, the limitation by the court should be for impeachment purposes only. In all such cases, the inquiry, and predicate if one be necessary, and the impeaching testimony if called for, must be confined to what was done and said by the witness there attacked, and cannot be broadened out to include other persons and relatives whose motives are of no moment in the case.

There is no better settled rule in this State than that mere corruptive or compromising efforts, words, and acts of friends or relatives, attempted in behalf of an accused, whose own connection therewith does not appear, are not admissible against him. Estep v. State, 9 Tex. Crim. App., 367; Branch's Crim. Law, Sec. 862, and authorities cited.

When, however, the party guilty of such conduct, is introduced as a witness, inquiry into such matters becomes pertinent, subject to the limitations announced. Such evidence is material, as showing motive, bias, or interest of the witness.

Confusion has arisen in some cases relative to this character of inquiry, growing out of the fact that predicates have been allowed and impeaching evidence permitted, which evidence was inadmissible *per se;* as when a wife is testifying for her husband, and on a predicate laid, proof of statements is made, which would not have been admissible in the first instance. See Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. R., 328; Hoy v. State, 45 S. W. R., 916.

There are also cases holding such evidence inadmissible, even when the persons guilty of the compromising or corruptive action were witnesses; but we do not think that such holding is safe or sound. Usually such cases go off on the proposition that the accused is not bound by such acts and words unless he authorizes them, which is not the true rule in a case where the party attacked is a witness; or else such cases are founded on an incorrect hypothesis that this character of evidence is collateral and not provable as an original proposition. Mr. Wigmore, in his work on Evidence, Sections 1003 to 1005, lays down as the test of what is collateral, the following: "Could the fact upon which error is predicated, have been shown in the evidence for any purpose independently of the contradiction?" and further proceeds to show that the following are not collateral, to wit: "(1) Facts relevant to some issue in the case, and (2) facts relevant to discrediting a witness." Discussing, thereafter, that bias of a witness is not a collateral matter, the author refers back to Section 948 in said work, in which section he says that particular conduct and circumstances form the only means practically available for effectively demonstrating the existence of bias in a witness. Another witness could hardly be asked his opinion as to the bias of a particular witness; and his reputation in that regard is out of the question, so that the conduct of the witness in question, and the circumstances of his situation become practically the sole available material for such inquiry.

Mr. Underhill, in his work on Criminal Evidence, Sec. 222, says the feeling, bias, and relationship of the witness are never collateral, and that the witness himself may be interrogated as to matters showing same, and if he denies it, then the contrary fact may be shown by others.

As said in Branch's Criminal Law, Sec. 861: "The motives which operate upon the mind of a witness when he testifies, are never regarded as collateral or immaterial matters. A party may prove declarations of a witness which tend to show that bias, interest, prejudice, or any other mental state, which fairly construed, might tend to affect his credibility." (See authorities cited). Also, in said section, Mr. Branch says: "The defendant is entitled to show animus and prejudice on the part of a State witness against him and its extent, and in such examination, great latitude is allowed, when the object is to impeach the credibility of said witness." (Citing authorities.) See also Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. R., 613.

What is said of the right of the accused to develop such matters is true of the right of the State. It must be conceded that no witness can be impeached, or his credibility attacked by showing bias or motive, upon proof of an immaterial statement or act except such as reputation, or other purely collateral matters; and the converse of this is true, that every statement or act sought to be legitimately proven as an attack upon a witness, must be on a material matter, and therefore is more or less an attack upon the party for whom such witness appears. Shall we then, forsooth, refuse to permit the motives, bias, or prejudice of a witness to be proven, because such evidence might be construed as an attack upon the accused? Not so; the evidence must be admitted and be properly limited, and there the matter ends. How could the animus or bias of a witness be more effectively shown than by proof that he has tried to corrupt the witnesses? To hold such proof inadmissible against such witness, is to attack one of the fundamentals, and is to dull the edge of the sword by which justice would seek to lay bare the hidden fountains of envenomed hatred, or partial affection, from either of which exact truth might not be expected.

So believing, we hold that the evidence of the acts and conversations of A. Nader and John Thomas, and others who were not witnesses, is absolutely inadmissible; while that of Alex George should be admitted, under the limitations herein indicated.

Inasmuch as the case must be reversed for the admission of the testimony referred to, we further observe that one should not be sworn and used as an interpreter who is a partisan, or cognizant of material facts, as was true in the instant case.

We find nothing in the evidence raising the question of accomplice, testimony as applicable to the evidence of the witness Barkett.

In every case where the issue of self-defense is raised, it is incumbent on the trial court to instruct the jury that in determining this issue, the matter should be viewed from the standpoint of the accused, and this is true though the issue be raised by the testimony of the defendant alone.

The errors relating to the argument of State's counsel will likely not occur again, but we will state that it is not proper for counsel for the State to argue to the jury his personal objection to the law of suspended sentence, or any other statute whose application is invoked.

For the errors referred to, the judgment of the trial court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

ON REHEARING.

March 24, 1920.

LATTIMORE, JUDGE.—It is urged upon motion for rehearing, that our opinion seems to indicate that it was decided on errors which were not shown by the bills of exception, but must have been deduced by us from matters which, if they appear at all, are in the statement of facts, and not in said bills. We do not think so, and in this connection we call attention to what we said in the case of Plummer v. State (decided at this term), on rehearing, and add that Articles 2059 and 2060, of Vernon's Civil Statutes, and Article 744, of our C. C. P., seem to provide the statutory rules governing the relation of bills of exception to statements of fact, and that any decision of the court which goes beyond a fair construction of said articles, would not be followed by us.

Adverting to the opinion in this case, we note that we held that Alex George, being a material witness for the defense, might be attacked by the State, by showing anything said or done by him in an effort to corrupt the witnesses for the State, but that in such attack, if the State got before the jury what was said and done in such effort, by other friends or relatives of the accused, who were not witnesses, and whose authority to so act was not shown to proceed from the accused, it would be reversible error. We look to see whether we got the facts upon which we based this part of our opinion, from the bill of exceptions:

Bill of exceptions No. 1, substantially sets forth that when Essie Thomas, the widow of deceased, was testifying the following questions were asked:

"Q. I want to ask you if Alex George said anything to you about a certain matter? I will ask it rather, did Alex George, either himself or with any one else, come to you in Shreveport, or anywhere else, after this killing, to talk to you about the killing?

A. She say Alex George and John Thomas and old man Nader they come down there and offer her six hundred dollars, because Elias Nader killed her husband. They give her that six hundred dollars to live on and her little boy.

Q. What, if anything, did Alex George want to do with the six hundred dollars?

A. She say they tell her give you that six hundred dollars to live on if she don't come to court and testify, you know, and they gave you that six hundred dollars."

Objection was made to these questions and answers on several grounds, among which are the following:—because it was an effort to impeach the witness on a collateral and irrelevant matter, and because the defendant, E. J. Nader, was in no way connected with the transaction inquired about, and could not be held responsible for the conduct of some other person, and because the matter testified to was highly prejudicial to the rights of the defendant, and was hearsay. The trial court appends an explanation to this bill, in which, among other things, he states that appellant objected to this testimony, because it was an effort to introduce prejudicial matter, with which defendant was not connected.

From appellant's bill of exceptions No. 1-A, it appears that the "Isn't it a fact that you had done all you possibly could do to help A. Nader buy out Charles Barkett and Bill Thomas, and the widow of deceased, by paying them money not to prosecute Nader?" following question was asked the witness Alex George:

He was also asked as follows: "Is it not a fact that you know that the Naders with your help offered to pay Charles Barkett money to leave the country and not testify in this case?"

He was also asked if he and A. Nader, the uncle of the accused, and Bill Thomas, did not go to Shreveport and undertake a settlement of the case. The witness denied all these matters.

In his explanation to this bill, the court says, that timely exceptions to these questions and answers were made, on the grounds, among others, that no attempt had been made to connect the accused with said transactions, and that he was not responsible for the acts of his relatives and friends, and same would be hearsay.

By bill of exceptions No. 2, it is made to appear that the State placed on the witness stand Spero Assef, who testified over objection, that A. Nader, John Thomas, and others, came to Shreveport and offered to pay sums of money to Essie Thomas, widow of deceased, and Charles Barkett, if they would not appear as witnesses on this trial. In this explanation to this bill, the trial court states that after Alex George had denied that he went with A. Nader, the uncle of the accused, to Shreveport soon after the killing in question, and tried to induce Charles Barkett, and the widow of the deceased, to take money to remain away from the court, Spero Assef was then called on the witness stand by the State, and testified that about a month after the killing, Alex George, A. Nader, and John Thomas, came to Shreveport and offered Charles Barkett and Essie Thomas certain sums of money to remain away from court; that this was objected to for various reasons, among others, that

the defendant was not connected therewith, and that it was an effort to impeach Alex George on a collateral matter.

We have given the substance of these bills of exceptions, setting forth the matters held by us to be inadmissible, to wit:   that A. Nader and John Thomas, who were not witnesses, and one of whom was the uncle of appellant, were present and took part in whatever corruptive efforts were sought to be proven against the witness Alex George.   More than a score of cases are cited by Mr. Branch, in Section 862 of his work on Criminal Law, all holding that the defendant cannot be bound by efforts of his relatives, attorneys, or friends, to suppress or manufacture testimony, which efforts were without his knowledge or consent; yet, in face of these authorities, we find that the State, as it appears from bill of exceptions No. 1a, is permitted to ask Alex George: "Is it not a fact that you know that the Naders, with your help, offered to pay Charles Barkett money to leave the country?" etc.

From the record, it is perfectly clear that the Naders referred to are the accused and his uncle, and the only inference from said questions is, that appellant and A. Nader acted together in trying to corrupt said witnesses:

In bill No. 1, it will be observed that the witness repeatedly answered:   "*They* came down there and offered   .   .   .   *They* gave her that   .   .   .   *They* told her."   This will not do.   Evidence as damaging to an accused as is proof that his uncle went to the widow of the deceased, and offered her money not to appear at court, cannot be gotten before the jury in such manner.   The question involved is not what *they* did, but what Alex · George did;— not what *they* said, but what Alex George said.   Alex George was the witness; *they* were not.   Alex George, upon his denial that he was present and heard A. Nader and John Thomas make the corruptive offer, could not be impeached by proof of the fact that he was present and heard them make such offer.   No such predicate or evidence is admissible, in the absence of something connecting the defendant therewith.   Such effort would be manifestly, not only to impeach the witness George on an immaterial and irrelevant matter, but also to get before the jury exceedingly harmful and injurious evidence of wrongful acts on the part of relatives and friends of the appellant, with which he is not connected, and the burden of which he ought not to be made to bear.

Complaint is made of our statement in the opinion, that "another offer was made of the same amount of money to the son of deceased," the complaint stating that such statement "is not true." The deceased was Bill Thomas.   We quote from the testimony of Spero Assef:   "This second offer of six hundred dollars was made to Bill Thomas's boy."

We have carefully examined all of said motion, and noted its

contentions, but believe a correct decision was announced by us originally; and said motion is accordingly overruled.

*Overruled.*